UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.


KELLERIE GANN,

          Plaintiff,

     v.

KATMAI GOVERNMENT SERVICES, LLC;

KATMAI INFORMATION TECHNOLOGIES, LLC;

CORPORATE ALLOCATION SERVICES, INC.; and

KATMAI TECHNICAL SERVICES, LLC


          Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Kellerie Gann, by and through her attorneys, HKM Employment Attorneys, LLP,

for her Complaint against Katmai Government Services, LLC; Katmai Information Technologies,

LLC; Corporate Allocation Services, Inc.; and Katmai Technical Services, LLC (collectively

"Defendants" or the "Company") states and alleges as follows:

### PRELIMINARY STATEMENT

1.     This is an employment discrimination case arising from Defendants' failure to

accommodate, discrimination toward, and wrongful termination of Plaintiff because Plaintiff

suffers from one or more disabilities within the meaning of the Americans with Disabilities Act

and because Plaintiff filed a workers' compensation claim.  In August 2018, Plaintiff sought

emergency care and treatment for symptoms – and filed a workers' compensation claim – related

to suspected carpal tunnel and tendonitis.  Plaintiff began undergoing conservative treatment, and in January 2019, underwent carpal tunnel release surgery.  Plaintiff returned to work following the surgery with medical restrictions, which included the amount of keyboard and mouse work that she could perform per day.  On March 19, 2019, while Plaintiff was still subject to medical restrictions, she was terminated by Defendants.

## PARTIES

2.      Plaintiff is, and at all times relevant to this Complaint was, a resident of Colorado.

3.      Defendant Katmai Government Services, LLC ("KGS"), is an Alaska limited liability company authorized to conduct business in Colorado.

4.      Defendant Katmai Information Technologies, LLC ("KIT") is an Alaska limited liability company authorized to conduct business in Colorado.

5.      Defendant Corporate Allocation Services, Inc. ("CAS") is a Colorado corporation.

6.      Defendant Katmai Technical Services, LLC ("KTS") is an Alaska limited liability company authorized to conduct business in Colorado.

7.      Collectively, Katmai Government Services, LLC; Katmai Information Technologies, LLC; Corporate Allocation Services, Inc.; and Katmai Technical Services, LLC are referred to herein as "Defendants" or the "Company."

8.      Plaintiff worked at Defendants' Westminster location, at 12110 Pecos, Suite #210, Westminster, Colorado.

9.      In the Position Statement it submitted to the Colorado Civil Rights Division concerning Plaintiff's claims alleged, KIT concedes it was Plaintiff's direct employer at all times relevant.

10.     Upon information and belief, KGS is a parent company of KIT.

11.     Upon information and belief, Defendants are deemed a single employer of Plaintiff by virtue of their centralized control of employment practices, common management, common rules regarding management, interrelations of operations, and common ownership or financial control.  Defendants are therefore jointly and severally liable on all claims asserted in this action.

12.     Upon information and belief, Defendants KIT, KGS, and KTS use the same employee handbook.

13.     Upon information and belief, Defendants use a centralized Human Resources department.

14.     Defendant KGS is an employer within the meaning of 29 U.S.C. § 2611(4)(A), in that it has more than 50 employees within a 75-mile radius.

15.     Defendant KIT is an employer within the meaning of 29 U.S.C. § 2611(4)(A), in that it has more than 50 employees within a 75-mile radius.

16.     Defendant CAS is an employer within the meaning of 29 U.S.C. § 2611(4)(A), in that it has more than 50 employees within a 75-mile radius.

17.     Defendant KTS is an employer within the meaning of 29 U.S.C. § 2611(4)(A), in that it has more than 50 employees within a 75-mile radius.

18.     Defendant KGS is an employer within the meaning of 42 U.S.C. § 12111(5)(A), in that it has 15 or more employees each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

19.     Defendant KIT is an employer within the meaning of 42 U.S.C. § 12111(5)(A), in that it has 15 or more employees each working day in each of 20 or more calendar weeks in the

current or preceding calendar year.

20.     Defendant CAS is an employer within the meaning of 42 U.S.C. § 12111(5)(A), in that it has 15 or more employees each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

21.     Defendant KTS is an employer within the meaning of 42 U.S.C. § 12111(5)(A), in that it has 15 or more employees each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

22.     Defendant KIT is a subsidiary of Defendant KGS.

23.     Defendant CAS is a subsidiary of Defendant KGS.

24.     Defendant KTS is a subsidiary of Defendant KGS.

## JURISDICTION AND VENUE

25.     Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

26.     This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 794 (Rehabilitation Act of 1970, § 504).  This Court has jurisdiction over Plaintiff's state claim pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claim is so related to the federal claims that they form part of the same case or controversy.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

28.     Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

29.     Plaintiff filed her Charge of Discrimination, Number 32A-2019-00472 with the Equal Employment Opportunity Commission for disability discrimination and retaliation on or about April 10, 2019.  Plaintiff was issued a Notice of Right to Sue with Respect to Charge Number 32A-2019-00472 pursuant to 42 U.S.C. § 2000e-5(f)(1) on June 1, 2020.  Plaintiff filed the present action within ninety (90) days of receipt of same.

30.     Plaintiff has met all administrative prerequisites prior to filing this action.

## FACTUAL ALLEGATIONS

31.     Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

32.     Plaintiff began working for Defendant CAS on or around September 24, 2004.

33.     When Defendant CAS was bought by Defendants, in or around July 2013, Defendants became Plaintiff's employers.

34.     Plaintiff worked for Defendants as a Manager 1 from July 8, 2013 until her wrongful termination on March 22, 2019.

35.     In or around July 2018, Plaintiff suffered from carpal tunnel symptoms requiring her to seek medical treatment.

36.     On or around July 9, 2018, Plaintiff reported the carpal tunnel symptoms to Defendants and filed a workers' compensation claim related to same.

37.     Starting on or around July 11, 2018, Plaintiff began physical therapy to treat the carpal tunnel.

38.     On July 31, 2018, Plaintiff went to the emergency department for pain related to carpal tunnel at the recommendation of one of Defendants' Human Resources representatives,

Huong Nguyen.

39.     Plaintiff provided a doctor's note to Defendants, asking to be off of work on July 31, 2018 and August 1, 2018 due to pain related to suspected carpal tunnel.

40.     On August 3, 2018, Plaintiff's workers' compensation provider, Dr. Julie Mullin, examined Plaintiff and gave Plaintiff a physician's report which included the following temporary restrictions, which were to be in place from August 7, 2018 to August 21, 2018:

    a.   Maximum lifting of 15 pounds;

    b.   Maximum repetitive lifting of 7 pounds;

    c.   Maximum carrying of 15 pounds; and

    d.   No more than four hours per shift of keyboard and mouse work.

41.     On August 3, 2018, Dr. Mullin also recommended occupational therapy, Diclofenac oral and gel (an anti-inflammatory used to treat pain and inflammation), a thumb spica wrist brace on left (noting that she already had one on the right), and using a vertical mouse.

42.     Beginning on August 3, 2018, Dr. Mullin repeatedly indicated that he suspected Plaintiff had "tendonitis and carpal tunnel."

43.     Plaintiff promptly provided her August 3, 2018 restrictions to Tammi Norcutt (Operational Manager for Defendants and Plaintiff's direct supervisor).

44.     Following receipt of the August 3, 2018 medical record, Ms. Norcutt instructed Plaintiff not to provide future medical records, as Defendants would receive the records directly from the workers' compensation provider moving forward.  Because Defendants received the workers' compensation documentation throughout Plaintiff's time treating the carpal tunnel and tendonitis, Defendants were promptly aware of all of Plaintiff's medical restrictions.

45.     Despite Plaintiff requesting the vertical mouse – with her doctors' recommendation – on or around August 3, 2018, Plaintiff did not receive same until around August 30, 2018.

46.     On numerous occasions between August 2018 and January 2019, Ms. Norcutt made comments indicating frustration about Plaintiff's disability and medical appointments, including but not limited to:

   a.   "You sure do have a lot of appointments."

   b.   Ms. Norcutt likewise stated, "AGAIN?" on numerous occasions when Plaintiff said that she had a medical appointment.

47.     A few weeks after Plaintiff reported her carpal tunnel and tendonitis symptoms – and sought workers' compensation coverage for same – Defendants began discussing whether to terminate Plaintiff.

48.     On or around August 25, 2018, Ms. Norcutt emailed Jerry Roach a copy of a draft email she intended to send to John Burke (then a Government Technical Representative, or Defendants' client), stating: "I know you have been telling me for sometime Kellerie is the source of most of my problems."

49.     On September 4, 2018, Dr. Mullin examined Plaintiff and gave her the following restrictions, which were to be in place from September 4, 2018 to September 25, 2018:

   a.   Maximum lifting of 15 pounds;

   b.   Maximum repetitive lifting of 7 pounds;

   c.   Maximum carrying of 15 pounds; and

   d.   No more than six hours per shift of keyboard and mouse work.

50.     In the September 4, 2018 physician's report, Dr. Mullin advised that Plaintiff

should attend occupational therapy twice per week, continue using thumb spica wrist braces on both hands, and use Diclofenac topical, Advil or Aleve.

51.     On September 26, 2018, Dr. Mullin examined Plaintiff and gave her the following restrictions, which were to be in place from September 26, 2018 to October 17, 2018:

      a.   Maximum lifting of 15 pounds;

      b.   Maximum repetitive lifting of 7 pounds;

      c.   Maximum carrying of 15 pounds; and

      d.   No more than six hours per shift of keyboard and mouse work.

52.     In the September 26, 2018 physician's report, Dr. Mullin advised that Plaintiff should attend occupational therapy twice per week, continue using thumb spica wrist braces on both hands, and use Diclofenac topical.  Dr. Mullin further referred Plaintiff for orthopedic evaluation and an electromyogram test ("EMG").

53.     In or around September or October 2018, Plaintiff asked Ms. Norcutt for the reasonable accommodation of providing a standing or raised desk, as Plaintiff's doctor had advised that this could improve her tendonitis and carpal tunnel symptoms.

54.     Ms. Norcutt denied Plaintiff's requested accommodation of providing a standing or raised desk.

55.     After researching standing desks, Ms. Norcutt decided to order a standing or raised desk with her personal card, complaining that the desk was "expensive," and it would be "a pain" to seek reimbursement from Defendants.  Ms. Norcutt provided the standing or raised desk to a *different* employee (who did not have a known or perceived disability, but – upon information and belief – had merely complained of back pain) rather than to Plaintiff, stating that she wanted to

"try it out" and "see how it goes" before providing a standing or raised desk for Plaintiff.

56.     Despite purchasing a standing or raised desk for another employee (who did not have a known or perceived disability), Defendants never provided this requested accommodation for Plaintiff.

57.     Throughout Plaintiff's treatment, Defendants disregarded Plaintiff's medical restrictions – Plaintiff was frequently forced to work in violation of her medical restrictions.  The following are a few, but not a complete list of, examples noted by Plaintiff's health care providers:

a.   On September 4, 2018 and September 26, 2018, Dr. Mullin noted that although Plaintiff experienced "[p]ain with excessive keyboard & mouse work" that Plaintiff was "[u]nable to limit her work hours or mouse work hours at this time."

b.   On September 27, 2018, Plaintiff's physical therapist noted that Plaintiff was "[m]ore stiff due to change of work flow."

c.   As noted by Plaintiff's physical therapist in notes on August 20, 2018; August 28, 2018; August 30, 2018; September 7, 2018; September 11, 2018; September 18, 2018; September 21, 2018; September 25, 2018; September 28, 2018; October 4, 2018; October 12, 2018; and again on October 26, 2018: "Some tasks changed at work and instead of a couple hours a day of computer work she has increased to 8 hours of computer work each day."

58.     From August 2018 through November 2018, Plaintiff frequently reported to Ms. Norcutt that it was painful for her to work long days (often ten hours or more, and often six days per week) in violation of her medical restrictions.  Ms. Norcutt would respond: "You're a manager; I am here, and so are you;" "We need to get this contract caught up;" and "This is the expectation

of managers." By these comments, she meant that Plaintiff was expected to violate her medical restrictions because she was a manager. Ms. Norcutt implied that if Plaintiff failed to work the painful, long hours (in violation of her medical restrictions), she would be subjected to negative consequences, including termination.

59. On October 30, 2018, Dr. Mullin examined Plaintiff and gave her the following restrictions, which were to be in place from October 30, 2018 to November 27, 2018:

    a. Maximum lifting of 15 pounds;

    b. Maximum repetitive lifting of 7 pounds;

    c. Maximum carrying of 15 pounds; and

    d. No more than six hours per shift of keyboard and mouse work.

60. On or around October 9, 2018, Defendants hired Julie Wilson, who had no known or perceived disabilities, as a Project Coordinator.

61. Soon after Ms. Wilson was hired, Defendants began assigning Ms. Wilson Plaintiff's job duties; and Plaintiff was subjected to a significant reduction in responsibilities that was disproportionate to Plaintiff's modest requests for accommodation and medical restrictions. Upon information and belief, Ms. Wilson was hired to replace Plaintiff.

62. Beginning in or around October 2018, Defendant KIT began excluding Plaintiff from client meetings that she had previously attended. The following are a few, but not a complete list of, examples:

    a. Ms. Norcutt and John Burke often coordinated these meetings and – despite the fact that Plaintiff was managing the contract involved – Ms. Norcutt did not coordinate with Plaintiff concerning the meetings.

      b.   On Ms. Norcutt's instructions, Julie Wilson was often asked to cover meetings – in particular with the Department of the Interior – instead of Plaintiff.

      c.   Even when Plaintiff attended client meetings or meetings with her supervisees, Ms. Norcutt began insisting that Ms. Wilson attend the meetings with her.  It seemed as though Ms. Norcutt was forcing Plaintiff to train her replacement.

63.     On December 21, 2018, Dr. Mullin examined Plaintiff and gave her the same restrictions as the September 26, 2018 visit, which were to be in place from December 21, 2018 to January 18, 2019.   Again, Dr. Mullin noted that Plaintiff had swelling, tingling, pain, and limitations in both hands and wrists; again, Dr. Mullin suspected forearm tendonitis and carpal tunnel.  Dr. Mullin also referred Plaintiff to Front Range Orthopedic Center for carpal tunnel release surgery.

64.     On or around January 15, 2019, Plaintiff underwent carpal tunnel release surgery.

65.     Plaintiff requested and received approximately three weeks of unpaid medical leave under the Family and Medical Leave Act to undergo and heal from her carpal tunnel release surgery (i.e. a serious health condition).

66.     On January 18, 2019 and January 25, 2019, Dr. Mullin examined Plaintiff and advised she was unable to work from January 18, 2019 to January 25, 2019.

67.     On January 25, 2019, Dr. Mullin examined Plaintiff and advised she was unable to work from January 25, 2019 to February 1, 2019.

68.     On February 1, 2019, Dr. Mullin examined Plaintiff and advised she was permitted to return to work, with the following restrictions in place from February 1, 2019 to February 15, 2019:

    a.   No lifting more than 15 pounds; and

    b.   No more than four hours per shift of keyboard and mouse work.

69.    Plaintiff returned to work following surgery on or around February 4, 2019 with the foregoing medical restrictions.

70.    Following her return to work on or around February 4, 2019, Plaintiff learned that the majority of her normal job duties had been assigned to other employees during her pre-approved medical leave.

71.    Upon her return to work, Plaintiff asked to resume her job duties.

72.    In response to this request, Tammi Norcutt responded (paraphrased): "No.  They are already delegated out and there is no need to give them back."

73.    On February 11, 2019, Plaintiff met with Ms. Norcutt to discuss how to adjust Plaintiff's work schedule so as to accommodate Plaintiff's medical restrictions.

74.    During the February 11, 2019 meeting, Plaintiff suggested that she would do computer work in the mornings and site visits in the afternoons each day.  Ms. Norcutt agreed to Plaintiff's plan and asked Plaintiff to begin providing her with Plaintiff's intended schedule in advance of each week going forward.

75.    On February 15, 2019, Dr. Mullin examined Plaintiff and advised she could continue working with the following restrictions in place from February 15, 2019 to March 15, 2019:

    a.   No lifting more than 15 pounds; and

    b.   No more than four hours per shift of keyboard and mouse work.

76.    On or around February 28, 2019, Plaintiff provided her schedule for the following

week to Ms. Norcutt.  This time, Ms. Norcutt seemed frustrated about the accommodation she had previously approved, which would have allowed Plaintiff to perform computer work in the mornings and site visits in the afternoons.  Ms. Norcutt snapped (paraphrased), "You already visited the sites, and there is no reason to visit them again."

77.    Defendants assert that in early 2019, Ms. Norcutt began discussing the elimination of Plaintiff's position with Jerry Roach, Director of Professional services.

78.    Defendants assert that in February 2019, Ms. Norcutt discussed the elimination of Plaintiff's position with Debra Dunn, Director of Human Resources.

79.    On March 15, 2019, Dr. Mullin examined Plaintiff and advised that she could continue working with the following restrictions:

   a.   No lifting more than 15 pounds; and

   b.   No more than six hours per shift of keyboard and mouse work in increments of no more than three hours straight.

80.    Plaintiff promptly provided the March 15, 2019 medical restrictions to Ms. Norcutt verbally.

81.    On or around March 19, 2019, Plaintiff was terminated.

82.    Plaintiff's final date of work was March 22, 2019.

83.    Defendants terminated Plaintiff because of her actual and/or perceived disability (carpal tunnel, tendonitis, and/or symptoms related to same), on-the-job injury, workers' compensation claim, and/or because Plaintiff requested reasonable accommodation or FMLA leave related to her disabling medical conditions.

## FIRST CLAIM FOR RELIEF
**(Disability and/or Perceived Disability Discrimination and Failure to Accommodate in Violation of Section 102(a) and (b)(5)(A) of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12112(a) and (b)(5)(A) against Defendants)**

84.    Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

85.    Plaintiff is a disabled person within the meaning of the ADA.

86.    Plaintiff suffers from carpal tunnel, tendonitis, and/or symptoms related to same.

87.    Plaintiff was qualified for her job and capable of performing the essential functions of her position with or without a reasonable accommodation.

88.    Plaintiff was regarded as being disabled by Defendants.

89.    Defendants denied Plaintiff the reasonable accommodation of providing a standing or raised desk.  The requested reasonable accommodation of a standing or raised desk would not have caused Defendants an undue hardship.

90.    Defendants likewise failed to engage in the requisite good faith interactive process with Plaintiff regarding reasonable accommodations under the ADA.

91.    On or about March 19, 2019, Defendants discriminated against Plaintiff because of her disabilities by terminating her employment because of Plaintiff's actual and/or perceived disabilities, in violation of the ADA.

92.    The effect of Defendants' discriminatory practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of Plaintiff's disabilities, and/or because of Defendants' denial of Plaintiff's requests for reasonable accommodations based on her disabilities.

93.    Defendants' above-described conduct was intentional.

94.     Defendants' above-described conduct was done with malice or reckless indifference to Plaintiff's federally-protected rights.

95.     As a direct and proximate result of Defendants' above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

**SECOND CLAIM FOR RELIEF**
**(Retaliation in Violation of the ADA, as amended, 42 U.S.C. § 12203(a))**

96.     Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

97.     Since July 2018, Plaintiff has made requests for reasonable accommodations related to her disabilities and/or perceived disabilities, to allow her to perform the essential functions of her position.  In doing so, Plaintiff was engaging in activity protected under the ADA.

98.     On numerous occasions, as explained above, Plaintiff requested reasonable accommodations related to her disabilities.   In doing so, Plaintiff was engaging in activity protected under the ADA.

99.     Defendants retaliated against Plaintiff after she engaged in the above-described protected activity.

100.    More specifically, Defendants terminated Plaintiff's employment.   These consequences are of the type that would tend to discourage similarly situated employees form requesting accommodations and/or complaining about or opposing illegal discrimination.

101.    A casual connection exists between Plaintiff's protected activities and Defendants' materially adverse actions, i.e. Defendants discharged Plaintiff because she requested and/or

required reasonable accommodations related to her disabling medical condition(s).

102.    Defendants' above-described conduct was intentional.

103.    Defendants' above-described conduct was done with malice or with reckless indifference to Plaintiff's federally-protected rights.

104.    As a direct and proximate result of Defendants' above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

<u>THIRD CLAIM FOR RELIEF</u>
**(Disability and/or Perceived Disability Discrimination and Failure to Accommodate in Violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.* (the "Rehabilitation Act"))**

105.    Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

106.    Exhaustion of remedies is not required for Plaintiff to bring this claim for discrimination and failure to accommodate under the Rehabilitation Act.

107.    Plaintiff is a disabled person within the meaning of the Rehabilitation Act.

108.    Plaintiff suffers from carpal tunnel, tendonitis, and/or symptoms related to same.

109.    Plaintiff was qualified for her job and capable of performing the essential functions of her position with or without a reasonable accommodation.

110.    Plaintiff was regarded as being disabled by Defendants.

111.    Defendants denied Plaintiff the plausibly reasonable accommodation of providing a standing or raised desk.  The requested reasonable accommodation of a standing or raised desk would not have caused Defendants an undue hardship.

112.    Defendants likewise failed to engage in the requisite good faith interactive process with Plaintiff regarding reasonable accommodations under the Rehabilitation Act.

113.    On or about March 19, 2019, Defendants discriminated against Plaintiff because of her disabilities by terminating her employment because of Plaintiff's actual and/or perceived disabilities, in violation of the Rehabilitation Act.

114.    The effect of Defendants' discriminatory practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of Plaintiff's disabilities, and/or because of Defendants' denial of Plaintiff's requests for reasonable accommodations based on her disabilities.

115.    Defendants' above-described conduct was intentional.

116.    Defendants' above-described conduct was done with malice or reckless indifference to Plaintiff's federally-protected rights.

117.    As a direct and proximate result of Defendants' above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

## FOURTH CLAIM FOR RELIEF
### (Retaliation in Violation of the Rehabilitation Act)

118.    Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

119.    Exhaustion of remedies is not required for Plaintiff to bring this claim for retaliation under the Rehabilitation Act.

120.    Defendants are beneficiaries of federal funding.  Defendants are therefore covered

by the Rehabilitation Act.

121.     Defendants' actions in terminating Plaintiff were in violation of 29 U.S.C. §§ 794, 504 of the Rehabilitation Act.

122.     Defendants knowingly and willfully engaged in the above-described conduct and retaliatory termination of Plaintiff.

123.     As a direct and proximate result of Defendants' above-described actions, Plaintiff has suffered damages, including monetary damages for back pay, benefits, future financial loss, and emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, prejudgment interest, and attorneys' fees and costs as permitted by law.

<u>**FIFTH CLAIM FOR RELIEF**</u>
**(Retaliation in Violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*)**

124.     Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

125.     Defendants operate in interstate commerce and have over 50 employees within a 75-mile radius of the location where Plaintiff was employed.  Defendants are therefore "covered employer(s)," as defined as 29 U.S.C. § 2611(4) under the FMLA.

126.     As "covered employer(s)" under the FMLA, Defendants are required to offer any "eligible employee," as defined at 29 U.S.C. § 2611(2), up to 12 weeks of leave from work.

127.     Defendants all constitute "employers" under the FMLA as the term "employer" includes "any person who acts, directly or indirectly, in the interest of the employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(1).

128.     The FMLA's purpose is to address the problem of "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4).

129.     Plaintiff availed herself of a protected right under the FMLA by taking FMLA leave for a serious health condition.

130.     Defendants took actions that a reasonable employee would have found to be materially adverse when (1) Defendants refused to allow Plaintiff to return to her pre-leave job duties and (2) when, approximately six weeks after Plaintiff returned from taking FMLA leave, Defendants terminated Plaintiff's employment.

131.     Defendants' violations of the FMLA were willful and without justification.

132.     Defendants' above-described conduct and violations of the FMLA were done with malice and oppression and with a conscious disregard for Plaintiff's rights under the FMLA.

133.     Plaintiff is entitled to damages equal to her lost wages, salary, employment benefits and other compensation denied or lost, liquidated damages as provided under the FMLA, costs, attorneys' fees, interest, and equitable relief as deemed appropriate.

## SIXTH CLAIM FOR RELIEF
### (Wrongful Termination in Violation of Public Policy)

134.     Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

135.     Plaintiff's employment was terminated by Defendants in retaliation for her being injured on the job and her filing of a valid Workers' Compensation claim and, thus, exercising her rights under the Workmen's Compensation Act of Colorado, C.R.S. § 8-4-101, *et seq.*

136.     Defendants' termination of Plaintiff's employment was in violation of public policy

of the state of Colorado.

137.    Plaintiff suffered mental and emotional distress as a direct and proximate result of Defendants' above-described acts and omissions.

138.    Plaintiff has suffered and will suffer lost wages and employment benefits as a direct and proximate result of Defendants' above-described acts and omissions.

139.    The above-described acts and omissions of Defendants were willful, malicious, oppressive, and calculated to discourage Plaintiff and Defendants' other employees from pursuing job-related rights under Colorado law.

140.    As a result of Defendants' above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience, and she is entitled to such general and special damages, economic damages, and garden-variety emotional distress damages as permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendants and order the following relief as allowed by law:

A.    Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life;

B.    Liquidated damages under the FMLA;

C.    Punitive damages as allowed by law;

D.    Attorneys' fees and costs of this action;

E.    Pre-judgment and post-judgment interest at the highest lawful rate; and

F.      Such further relief as the Court deems just and proper.

## **<u>JURY TRIAL DEMAND</u>**

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 4th day of June 2020.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: *<u>/s/ Jesse K. Fishman</u>*
     Shelby Woods
     Jesse K. Fishman
     HKM Employment Attorneys LLP
     730 17th Street, Suite 750
     Denver, Colorado 80202
     swoods@hkm.com
     jfishman@hkm.com
     *Attorneys for Plaintiff Kellerie Gann*